IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION

```
UNITED STATES OF AMERICA    )
                            )
        v.                  )   CRIMINAL ACTION NO.
                            )     3:08cr209-MHT
CARLOS L. BROOKS            )          (WO)
```

OPINION AND ORDER

This case is again before the court on the question whether defendant Carlos L. Brooks is mentally competent to stand trial.  This court previously found him competent.  United States v. Brooks, 2010 WL 2267030 (M.D. Ala. June 7, 2010).  Upon the request of Brooks's counsel and based on so-called "newly discovered evidence" in the form of a new expert report and opinion, Mot. at 1 (Doc. No. 135), the court granted a second competency hearing pursuant to 18 U.S.C. § 4241(a).[1]  The

_____

1.  18 U.S.C.§ 4241(a) directs a court to "grant the motion [for a hearing to determine competency], if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of
(continued...)

hearing was held November 15, 2010.  After reviewing all of the evidence, including that presented at the first hearing as well as the second, the court orally concluded on the record just prior to the beginning of Brooks's jury trial that he continues to have the mental capacity to stand trial.  The court promised that a written order would follow, and this is that order.


## I.   BACKGROUND

A one-count indictment charged Brooks with knowing possession of a firearm, having previously been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1).

Prior to his arrest, while at work on March 26, 2008, Brooks was involved in an industrial accident.  Over 1,000 pounds of lumber fell on him from a forklift.[2] Based upon "his observations of [Brooks's] demeanor and

---

1(...continued)
the proceedings against him."

2.   There seems to be some dispute as to exactly how much lumber fell on Brooks, but there is a consensus that it was at least 1,000 pounds.

communications" and his belief that Brooks had suffered neurological damage in the accident, defense counsel requested the first competency evaluation and hearing. Mot. at 1 (Doc. No. 80).  On the basis of evidence received at that hearing, including a report submitted by psychologist Robert Johnson, Ph.D., the court found that Brooks's "disabilities have not rendered him incompetent to stand trial."  Brooks, 2010 WL 2267030 at *4.

Subsequent to the first competency hearing but still prior to trial, Brooks's counsel claimed to have found new evidence regarding Brooks's competency--namely, a second neuropsychological examination of Brooks, conducted by Robert Schaffer, Ph.D.  Dr. Shaffer's assessment was filed as an attachment to counsel's motion for a second hearing.  Because "the neuropsychological condition of Defendant is of such paramount constitutional importance" and due to his continued belief that Brooks was severely impaired by his head injury, Brooks's counsel requested that the court

"revisit its prior determination of Defendant's competency." Mot. at 2 (Doc. No. 135). The court agreed, and held a second competency hearing just prior to trial, on November 15, 2010. At the hearing, the court received testimony from Dr. Shaffer, as well as from the government's expert, Dr. Johnson, who had previously submitted a report but had not testified at the first hearing. In addition, the court received testimony from Bureau of Alcohol, Tobacco and Firearms Agent Timothy Fitzpatrick; Brooks's former fiancee Tyshenia Foster; his close friend Jeremy Glenn; and Brooks himself. Defense counsel conceded that his argument centered on Brooks's lack of competency as a result of the accident, and, although Brooks is mentally challenged, not on any pre-existing condition.


## II. DISCUSSION

18 U.S.C. § 4241(a) provides that,

> "At any time after the commencement of
> a prosecution for an offense and prior

4

> to the sentencing of the defendant, the
> defendant or the attorney for the
> Government may file a motion for a
> hearing to determine the mental
> competency of the defendant. The court
> shall grant the motion ... if there is
> reasonable cause to believe that the
> defendant may presently be suffering
> from a mental disease or defect
> rendering him mentally incompetent to
> the extent that he is unable to
> understand the nature and consequences
> of the proceedings against him or to
> assist properly in his defense."

18 U.S.C. § 4241(a). Citing this statute, the Supreme
Court has stated, in dicta, "that the accused in a
federal prosecution must prove incompetence by a
preponderance of the evidence." Cooper v. Oklahoma, 517
U.S. 348, 362 (1996); see also United States v. Robinson,
404 F.3d 850, 856 (4th Cir.) ("Under federal law, the
defendant has the burden ... '[to show] that the
defendant is ... mentally incompetent.' ") (citing 18
U.S.C. § 4241 and Cooper), cert. denied, 546 U.S. 916
(2005). However, the Eleventh Circuit Court of Appeals
has suggested differently, stating that "the relevant
competency statute arguably contemplates that the burden

5

will lie with the party making a motion to determine competency." United States v. Izquierdo, 448 F.3d 1269, 1276-1277 (11th Cir. 2006).  This court need not resolve whether, in this case, the government has the burden of proving Brooks competent or Brooks has the burden of proving himself incompetent, for the outcome here would be the same regardless.

The court has considered all of the evidence and testimony in this case and concludes again that Brooks is not "presently [] suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense," as required by 18 U.S.C. § 4241(d) for a finding of incompetence.

The seminal case Dusky v. United States set out the standard for assessing mental competency, with the Supreme Court holding that "the test must be whether [the defendant] has sufficient present ability to consult with

6

his lawyer with a reasonable degree of rational understanding--and whether he has a rational as well as a factual understanding of the proceedings against him." 362 U.S. 402, 402 (1960). The Eleventh Circuit has adopted this standard and applies it as a two-prong test, requiring that a district court first determine whether "the defendant suffer[s] from a clinically recognized disorder," before proceeding to the <u>Dusky</u> standard. <u>Bundy v. Dugger</u>, 850 F.2d 1402, 1408 (11th Cir. 1988). Therefore, a court cannot base its decision merely on a clinical diagnosis, but must look beyond labels to decide whether a defendant has the understanding necessary to aid both himself and his lawyer in mounting a proper defense. <u>See</u> <u>United States v. Makris</u>, 535 F.2d 899 (5th Cir. 1976) ("The medical description or classification of defendant's illness, however, does not end the inquiry. The court is faced with the difficult task of analyzing

the medical and other evidence to arrive at a legal conclusion."). [3]

Here, as to whether Brooks suffers from a "clinically recognized disorder," Bundy, 850 F.2d at 1408, the court will assume for the purposes of this opinion that he does, based on his low I.Q. score and performance on the various tests administered to him by Drs. Johnson and Shaffer.  As to the Dusky standard (that is, whether Brooks has an understanding of the proceedings and the ability to rationally consult with his lawyer), the court finds that he does, and bases this conclusion on the following evidence.

First, the court is impressed by the testimony of Dr. Johnson, whose report was submitted prior to the first hearing and who testified at the second hearing.  In his report, Dr. Johnson summarized the results of various

_____

3.  In Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

tests he administered to Brooks, as detailed in this court's previous opinion:

> "Brooks was ... transferred to the Federal Correctional Institution at Fort Worth, Texas. He was there examined and evaluated from November 20, 2009, through January 4, 2010, by Robert Johnson, Ph.D., a licensed psychologist. Over the course of this evaluation, Brooks underwent a number of psychological tests, including the Evaluation of Competency to Stand Trial-Revised, the Personality Assessment Inventory, the Conners' Continuous Performance Test II, the Wisconsin Card Sort Test, the Rey Auditory Verbal Learning Test, the Rey Osterreith Complex Figure Test, the Trail Making Test A and B, the Rey Fifteen Item Test, the Test of Memory and Malingering, and the Wechsler Abbreviated Scale of Intelligence.FN2 Brooks also 'participated in clinical interviews and his behavior was observed by psychology and correctional staff to include telephone monitoring.' Dr. Johnson's Report at 3 (Doc. No. 86)."

Brooks, 2010 WL 2267030, at *1 (footnote omitted). Dr. Johnson found Brooks competent, stating that, "He does not currently present with a mental disease or defect that precludes his ability to understand the nature and

consequences of his charges." Dr. Johnson Report at 16

(Doc. No. 86).  His analysis suggested that Brooks is

mentally disabled, but understands the legal proceedings

in which he is involved.  As Dr. Johnson noted in his

report, Brooks was able to articulate the roles of the

judge, prosecuting attorney, and defense counsel.  Id. at

12.  Brooks also confirmed his understanding of the roles

of his lawyer and the prosecuting attorney at the

hearing.  Dr. Johnson acknowledged that Brooks's I.Q.

score was within the Mildly Mentally Retarded range, but

that Brooks also showed signs of 'malingering,' that is,

he was not performing on tests to his capability or he

was even faking.  Id. at 8.  At the second competency

hearing, Dr. Johnson essentially reaffirmed his findings

and conclusions regarding Brooks's competency.  While he

did concede that Brooks has some mental deficiencies,

largely incurred as a result of his head injury, he also

testified that he believed that Brooks was competent to

stand trial.

10

Second, Dr. Johnson's concerns regarding possible malingering by Brooks were reinforced by testimony regarding monitored phone calls between Brooks and his family. In those calls, Brooks gave detailed instructions regarding wiring money to the prison and the price of phone calls. The court found Dr. Johnson's description of the calls persuasive as to Brooks's ability to understand and remember important information. The fact that Brooks could tell his family his address and that "It's twenty cents a minute for 15 minutes; three dollars for a phone call if I call you direct," Dr. Johnson's Report at 9, and the fact that he understands the implication of that information, show that Brooks can remember important facts and communicate them to others. This is also further evidence that Brooks may have malingered in the assessments performed by both doctors. Indeed, this court finds it difficult to believe that a man with an IQ of 40 (as Dr. Shaffer contends), or even 64, could understand the  computation of phone-call costs

11

and relay that to others and remember and spell out
addresses.   Thus, while the court appreciates Dr.
Shaffer's testimony regarding Brooks's low cognitive
skills, poor memory, and inability to perform some tests
at even a child's level, the court also believes some of
those findings are not supported by the evidence and are
instead more evidence of malingering.

Third, that Brooks was malingering (that is, he was
not performing on tests to his capability or he was even
faking) was reinforced by evidence, received at the first
hearing in the form of a report of Agent Fitzpatrick.
The court had the benefit of the agent's live testimony
at the second hearing, as well.   Brooks's statement to
Agent Fitzpatrick contains a level of detail that leads
the court to believe he has sufficient memory and
understanding to stand trial.   Brooks clearly remembered
the events leading up to his arrest and was even able to
tell Agent Fitzpatrick that "he was very scared when he
realized the gun was in there because he knows that he is

a convicted felon and knew the officers would not believe his story." Report ¶ 7 (Doc. No. 34-1).  This evidences "a rational as well as a factual understanding of the proceedings against him," Dusky, 362 U.S. at 402, and shows that Brooks can present a coherent narrative as to what happened to him and why.  Brooks's description of the events shows that he is able to work with his attorney on presenting a defense.  At the hearing, Agent Fitzpatrick testified that he took care to clearly inform Brooks of his rights, as he does with any suspect.  In the interview, Brooks reviewed and signed a waiver of rights form.  Report ¶ 1 (Doc. No. 34-1).  Agent Fitzpatrick also said that Brooks seemed to have a good recollection of his arrest and that he was able to describe the events in some detail without any apparent loss of memory or impairment.  For instance, Brooks remembered in the interview that he had dropped his former fiancée Foster off to get her hair done before he

13

was stopped by the police, and in her testimony Foster confirmed that this was correct.

The court recognizes that Brooks contends that he remembered all of this information because his lawyer had shown him the police video footage of his arrest and discussed with him the circumstances of his arrest. Regardless, Brooks was able to recall and relate the story in an interview that took place a month later. The court cannot believe that a man with an I.Q. at the level of mental retardation as claimed by Dr. Shaffer could even parrot back information with that level of particularity. Furthermore, there is nothing the court finds credible in the record to support Brooks's contention that his lawyer obtained such detailed information regarding the incident and relayed it to him. But perhaps more importantly, the police footage does not in any way show the detail that Brooks was able to give to Agent Fitzpatrick. The court believes, and so finds, that Brooks simply remembered in detail his arrest, and

14

the events leading up to it, when he described them to Agent Fitzpatrick.   The court does not believe that Brooks cannot remember the details of the alleged crime and his arrest.

Furthermore, even if Brooks had forgotten the details of his arrest that would not render him incompetent. "[T]he crime and the defendant's whereabouts can be properly reconstructed without the defendant's testimony," since there is police footage of the arrest and he previously described the incident to Agent Fitzpatrick.   United States v. Rinchack, 820 F.2d 1557, 1559 (11th Cir. 1987) (holding that "amnesia does not render a defendant automatically incompetent.").

Fourth, the court's concern regarding malingering was bolstered by Brooks's own testimony at the second hearing.   On the one hand, Brooks's attorney put Brooks on the stand so that, as the attorney hoped, the court could see for itself that Brooks was not competent. Admittedly, Brooks was unable to answer many of the

questions his attorney posed, repeatedly stating "I don't remember," or "I don't know."  He said that he feels the accident changed him and that, "There's a lot of things I really can't explain that I go through."  He testified that he has nightmares and that he engages in self-mutilation such as pulling out his pubic hairs and toenails, but he does not know why.  He said he is unable to read more than rudimentary words and has both long- and short-term memory loss.  Brooks also said that he could not remember the circumstances of his arrest because he "blacked out" once he found the gun in his glove compartment.  He then testified that he was able to relate the events of his arrest during an interview with Agent Fitzpatrick a month later because his attorney had shown him the video of the incident multiple times and talked to him about what had happened.  He accused Agent Fitzpatrick of "tricking" him into admitting he had a gun, saying that Agent Fitzpatrick had told him he could

16

help him, but that if Brooks did not cooperate he would get a sentence of 15 years.

On the other hand, and more convincingly as to the issue of competency, however, the court was struck how Brooks went into some detail about his interview with the agent and why he felt he had been "tricked." Brooks had a very clear memory of the interview and was able to relate aspects of it in detail, including what the agent told him about his crime and possible sentence. For instance, Brooks testified that:

> "I told him--he told me to sign the paper and I signed the paper and I told him that I didn't remember what happened. And he told me if I didn't talk to him they were going to give me 15 years. And so I told him what I saw from the film and I told him that I blacked out and I told him I was on all types of medication. I told him what I was going through and he said he was going to try to help me and then he got me indicted."

Thus, Brooks understood that talking to the agent and admitting certain facts had led to his being, in his own correctly technical word, "indicted." He further

correctly understood that he was facing a possible sentence of 15 years.  He spoke coherently and fluidly when describing the interview and even became animated. Furthermore, Brooks was able to engage in an exchange involving simple math and confirmed that he dresses himself and cares for his own basic hygiene.  The court finds Brooks's testimony persuasive to the fact that, while he is clearly mentally impaired, he also clearly has the competency to understand the charges against him and assist his attorney, as <u>Dusky</u> requires.

The court emphasizes that it has considered its own in-court observations of Brooks with great caution. Because a court lacks mental-health expertise and because a court's own in-court observations will more than likely have been only quite brief (in comparison with the observations of experts and others, including family and friends, who may know the defendant well), the court, in reaching the important decision of whether a defendant is mentally competent, should be reluctant to give too much

credit to its own brief and essentially lay observations, especially if those observations are not supported by evidence from others (expert or lay) who know the defendant.  Here, the court's in-court observations of Brooks were strongly reinforced by other evidence, in particular Dr. Johnson's report and testimony, Agent Fitzpatrick's report and testimony, and Brooks's own conversations during his monitored calls.

Fifth, the court considered the testimony of Dr. Shaffer.  He elaborated on the results of the following tests he performed on Brooks, which he refers to in his report:  the Kaufman Brief Intelligence Test, Second Edition, the Finger Oscillation Test, the Trailmaking Test, the Tower of London, the Stroop Neuropsychological Screening Test, the Boston Naming Test, the Controlled Oral Word Association Test, the Gudjonsson Suggestibility Test, and the Competency Assessment to Stand Trial for Mentally Retarded (CAST-MR).  Dr. Shaffer's report assesses Brooks's IQ at 40--substantially lower than the

19

IQ of 64 that Dr. Johnson measured.  Dr. Johnson's Report at 8 (Doc. No. 86).  Dr. Shaffer also found that "Extra assistance was required for Mr. Brooks to perform several tests even at levels typically performed without assistance by children and those with mild to moderate brain injury."  Dr. Shaffer's Report at 3 (Doc. No. 135-1).  On one test, Dr. Shaffer described Brooks's performance as "consistent with severe neuropsychological deficit or of moderate mental retardation."  <u>Id</u>. at 5. He also found that Brooks's "severe short term verbal memory deficit is consistent with previous findings by Dr. Johnson."  <u>Id</u>.  However, while Dr. Johnson had determined that Brooks "has a general understanding of the role of the various court personnel and court proceedings," Dr. Johnson Report at 12 (Doc. No. 86), Dr. Shaffer found that Brooks's performance on the CAST-MR was "more consistent with those found not competent for trial," and that he had trouble responding to questions about basic legal concepts and trial procedures.  Dr. Shaffer's Report at 5 (Doc. No.

20

135-1).    Dr.   Shaffer   concluded   that   "Mr.   Brooks
demonstrates some of the lowest functioning that I have
seen on these tests."    <u>Id</u>.    As a result of Brooks's low
IQ, "severely distorted memory," "lack of understanding
of his condition in relation to the proceedings," and his
likely inability "to be able to hold up mentally under the
stress of a trial," Dr. Shaffer came to the conclusion
that Brooks was incompetent to stand trial.    <u>Id</u>. at 6.
He reaffirmed this finding during his testimony at the
second competency hearing.

The court finds that it cannot accept Dr. Shaffer's
testimony for several reasons.  First, Brooks's monitored
telephone calls do not reflect the conversations of a man
with an I.Q. of 40.  Second, the manner in which Brooks
related the facts of his arrest to Agent Fitzpatrick
evidence a higher level of functioning and memory than
that measured by Dr. Shaffer.  And finally, Brooks's own
testimony at trial contradicts Dr. Shaffer's findings.
Brooks is clearly not a man with such a low I.Q.--he has

a competent memory; not only can he find his away around,
he can even drive a car by himself about his community;
he is able to count and handle money; and he can see to
his basic aspects of personal care.  See In re Glenn
Holladay, 331 F.3d 1169, 1175 (11th Cir. 2003) (noting
that mental retardation is a product of both IQ scores and
"an individual's ability to adaptively function in
society").  While Dr. Shaffer did not believe Brooks was
malingering, he could not say for certain that it was not
a possibility.   The evidence convinces the court that,
without a doubt, Brooks was, and still is, malingering.

Finally, the court has carefully considered the
testimony of Brooks's former fiancee Foster and close
friend Glenn.  They credibly related that Brooks has
suffered a debilitating injury and no longer has the
capabilities he had before.  Both testified as to the
changes in Brooks's mental capacity and personality since
his accident.  Foster noted that Brooks could no longer
manage his money as well as he had before, that he had

trouble picking out clothes, and that he often called people close to him by the wrong name. Glenn testified that Brooks could no longer easily drive to familiar places or shop by himself and that he was less outgoing than before. However, it is clear that Brooks can still handle money, as there was other testimony indicating that he went shopping by himself even after the accident. In addition, Brooks engaged in a colloquy in court regarding making correct change from a dollar. Furthermore, the fact that Brooks was arrested after a traffic stop, in which he was alone in the car, indicates that he could and did still drive. Thus, Foster's and Glenn's testimony, while showing that Brooks suffers from certain impairments, undermines the contention that he is so severely impaired as to be incompetent to stand trial.

***

The court has sympathy for Brooks's lawyer, who is confronted with representing a client who suffers from

23

some mental disabilities and may not understand all of the complexities of criminal law.   Nonetheless, "[e]ven perfectly competent defendants often do not fully comprehend the intricacies of some of the defensive theories offered by their lawyers.   That level of comprehension is not a requirement of competency." United States v. Hogan, 986 F.2d 1364, 1373 (11th Cir. 1993). Therefore, Brooks's attorney is faced with the difficulty that every lawyer has when faced with representing someone who, though competent, suffers from a mental deficit.   The court is fully knowledgeable, from past experience, of defense counsel's most able capabilities and believes he can, and will, rise to the occasion and continue to provide his client with a vigorous defense.   Moreover, because the court is convinced that Brooks is malingering, some of the obstacles faced by the defense are of Brooks's own doing for which Brooks himself must bear the consequences.

Accordingly, it is ORDERED and DECLARED that defendant Carlos L. Brooks is, and continues to be, mentally competent to stand trial, meaning that he is not currently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

DONE, this the 14th day of December, 2010.

_____/s/ Myron H. Thompson_____
UNITED STATES DISTRICT JUDGE